FILED

2009 Oct-27  AM 09:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMIE KOHSER MARKS,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-08-BE-0459-S** |
| | ] | |
| **U.S. SECURITY ASSOCIATES, INC.** | ] | |
| **et al,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

This case comes before the court on Defendant U.S. Security Associates, Inc.'s "Motion for Summary Judgment" (doc. 86). The parties have fully briefed the motion. The court has considered the parties' filings and the applicable law. For the reasons stated below, the court DENIES the motion for summary judgment (doc. 86) because the plaintiff raised genuine issues of material fact.

### Facts

The following facts are viewed in the light most favorable to the non-moving party, *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999), and are the facts only for summary judgment purposes.

Plaintiff Marks worked for U.S. Security Associates as a security guard. She alleges that, during her employment, she suffered sexual harassment and gender discrimination. Also, Marks claims that after reporting the alleged harassment to her immediate supervisor, USSA retaliated against her by undermining her supervisory authority and making her work longer hours.

1

Further, Marks claims that USSA was negligent in its hiring, retention, supervision, and training of Defendant Hargrove, Marks' supervisor and alleged harasser.  As a result of the alleged harassment, Marks also brings invasion of privacy and outrage claims against USSA and Hargrove.[1]

<u>United States Security Associates</u>

Defendant USSA is a company that provides security guard services to its clients.  Once USSA contracted to provide security guard services at a particular location, USSA would send its security guards to fulfill the terms of the contract.  The security guards reported to a site supervisor.

Jim Flowers has been the Director of Administration for USSA since 1990.  Among other departments, Human Resources and the Benefits sections report to Flowers.  Debbie Givens is an HR Manager; she reports to Flowers.

<u>The USSA Hierarchy in Birmingham, AL</u>

At the Birmingham USSA office, the site supervisor, Plaintiff Marks, reported to the Operations Manager, Melissa Rodriguez, who in turn reported to the District Manager, Defendant Hargrove.  As a Manager in the South Central Business Unit of USSA, Hargrove reported directly to Al Sarnese and indirectly to Tia Waller-Johnson, Vice President of Operations.  USSA provided Hargrove with Security Supervisor Training.

<u>USSA's Hiring of Hargrove</u>

Hargrove applied to work as a Security Guard with USSA on May 26, 2004. USSA performed a criminal background check on Hargrove in May 2004.  The results of the

---

[1]Hargrove did not file a motion for summary judgment.

background check did not show any criminal history; however, Plaintiff Marks asserts that USSA neither reasonably nor diligently performed the background check.  USSA also checked Hargrove's previous employment *dates*.  Plaintiff asserts that had USSA more thoroughly checked Hargrove's employment history, it would have discovered a long history of Hargrove sexually abusing women.

The US military discharged Hargrove from the Marine Corps with a "less than honorable" discharge after at least five female cadets accused him of physical abuse and harassment, including allegations of sexual harassment.  After his less-than-honorable discharge from the Marines, Hargrove worked for Wackenhut, a security company similar to USSA. Hargrove resigned from Wackenhut after a female employee, Jennifer Windom, accused him of sexually harassing her.  After Wackenhut management received Windom's complaint, Hargrove resigned a few days later.  Hargrove denied Windom's claims.

Hargrove's Training

Although Hargrove applied for a Security Guard position, Hargrove never worked as a Security Officer; USSA immediately brought Hargrove into the office as Operations Personnel. Hargrove's responsibilities included managing the staff in USSA's Birmingham, Alabama office. Specifically, Hargrove managed USSA site managers.  In July 2004, USSA promoted Hargrove to Branch Manager; however, Plaintiff asserts that USSA promoted Hargove to District Manager–the highest USSA managerial position in Alabama.  The parties agree that Hargrove is currently the District Manager and the highest ranking official for USSA's Alabama operation.

USSA trained Hargrove on "Counseling & Sexual Harassment" and Hargrove signed the training score sheet indicating that he viewed the course material and that his answers were his

own.  Further, Hargrove received twenty-six hours of on-the-job training.  Hargrove received a

certificate on management training from USSA.  However, based on *her* USSA training

experience and the harassment she allegedly received at the hands of Hargrove, Marks contends

that Hargrove's USSA training was  inadequate.  Hargrove last received sexual harassment

training in November 2006.

Marks' USSA Employment

Plaintiff Marks applied for employment with USSA on April 28, 2006.  Defendant Chris

Hargrove interviewed her for the position of security guard that same day.  Marks alleges that

from the initial interview with Hargrove, his actions and conduct were always of a sexual nature

whenever no one else was around.

On the day he interviewed her, Hargrove told Marks she was a sexy lady; asked if she

knew how to use her tongue ring; asked her if she "spit or swallowed;" and wanted to know if

she would be interested in him.  Marks is married.  After the interview was over, Hargrove

extended his hand to Marks, who took it, then he shook it and simultaneously gently touched the

lower inside of her palm as he said he was looking forward to working with her.

USSA hired Marks and she signed a form acknowledging receipt of USSA's Officer's

Guide.  Above her signature acknowledging receipt is the following statement: "I agree to read

and comply with the contents of this Guide as a condition of my employment as a Security

Officer.  Further, I understand that failure to comply with the rules and regulations contained

herein could result in disciplinary action up to and including termination."

On April 30, 2006, Marks began working as a Security Officer for Defendant USSA.

Marks understood that her role as a security guard ("S/O") was to protect the assigned building or

4

facility of USSA clients.  Marks reported directly to Melissa Rodriguez, the Operations Manager for USSA's Birmingham location.  Both Marks and Rodriguez reported to Chris Hargrove, District Manager.  On August 1, 2006, Marks' supervisor, Melissa Rodriguez, asked Marks to be a Site Supervisor.

According to Marks, training videos, along with pornography videos, were in the uniform room, where she took training tests.  Hargrove made countless lewd and suggestive comments, grab her "butt" and breasts, and ask if she would watch porno films with him while he masturbated.

Hargrove invited Marks to motel rooms, called her late at night while she was on-post, and said he was masturbating and watching porn.  Hargrove asked if they could get a motel room together and said that his wife would never know.  He told Marks he could come and visit her on the job site late at night.  Hargrove called Marks on her phone while she was on duty, told her that he was "jacking off" and asked her to please talk to him.  Marks stated that Hargrove made references on telephone calls to her while she was at work about wanting "to eat my P word."

Hargrove asked Marks for oral sex.  Hargrove also told Marks to "suck his dick" in an intimidating manner.  Marks testified that Hargrove would put his arm around her and that he pulled his pants down and exposed his genitals.  Hargrove repeatedly asked Marks what she could do with her tongue ring as his way of asking for a "blow job."  Marks refused all Hargrove's advances.

Marks repeatedly complained to Rodriguez that Hargrove was sexually harassing her.  Marks asserts that she reported to her supervisor, Melissa Rodriguez, about Hargrove's grabbing her butt and breasts.  Plaintiff also claims that after working for USSA for about a month, her

sister, Lauren Conway, told Rodriguez about Marks' complaints about Hargrove.  After these initial complaints, both Rodriguez and Hargrove came to see Marks and made her sign a statement that the harassment did not occur.  The harassment, however, continued.

On January 4, 2007, Marks told Rodriguez that she had all she could take and that she was tired of the harassment and abuse.  Marks told Rodriguez that Hargrove sexually harassed her every time she was left alone with him.  Rodriguez told Marks that other women had also complained to her about Hargrove sexually harassing them, but that she needed actual proof. Rodriguez told Marks that unless she actually saw Hargrove sexually harassing her, she could do nothing; but if she caught him, he would be fired.

Therefore, Marks and Rodriguez planned to catch Hargrove sexually harassing Marks. Marks told Rodriguez that she could catch Hargrove in the act because he would certainly harass her if Rodriguez left the office for any period of time.  Marks told Rodriguez that Hargrove was constantly propositioning her every time Rodriguez left.

On that same day, Rodriguez and another office employee left Marks in the office alone with Hargrove.  Before she left, Rodriguez told Marks that if Hargrove starting sexually harassing her, Marks was to call Rodriguez' cell phone and Rodriguez would immediately come back to the office.  Marks preprogramed Rodriguez' cell phone number into her cell phone so that she would only have to push the "send" button to call Rodriguez if Hargrove began sexually harassing her.  Rodriguez also set up a tape recorder in the uniform room where Marks was working to organize the room.

When Rodriguez left the office, Hargrove entered the uniform room and told Marks that she could have Rodriguez' job if Marks worked hard enough.  Then Hargrove asked Marks to

perform oral sex on him.  Marks refused Hargrove's invitation, but undeterred, Hargrove pulled

down his pants, exposed his penis and started manipulating his penis to full erection in front of

Marks.  As soon as Hargrove undid the belt on his pants, Marks pressed the cell phone "send"

button to signal to Rodriguez that Hargrove was sexually harassing her, and to please come help.

Within two minutes, Rodriguez returned to the office, opened the door and caught

Hargrove with his pants down in the uniform room.  Hargrove immediately crouched down

behind the table.  When he stood up, his pants had wet spots on the front and his penis was still

erect.  Rodriguez began screaming at Hargrove and Marks.  Then Rodriguez told Marks to

immediately leave the room.  Unbeknownst to Marks and others, Rodriguez and Hargrove were

involved in a sexual relationship.

The next day, Rodriguez called Marks and told her that Hargrove had been terminated

and that she could come back into the office and work.  Marks returned to the office and noticed

that Hargrove's office appeared to have been cleared out.  Rodriguez told Marks that she had

called USSA's corporate office and reported the sexual harassment to Hargrove's supervisor and

that he would not be back in the work place.  However, two days later, Hargrove was back in the

office and began directly supervising Marks and Rodriguez again.

Thereafter, Plaintiff alleges that her work conditions became intolerable.  Hargrove

repeatedly undermined Marks' authority as a Site Supervisor by changing the schedule that

Marks had posted for the guards for whom she was responsible.  Although Marks would set a

schedule as site supervisor for the guards working at her direction, Hargrove would call them and

say that Marks had made a mistake and that they were not to come in to work or were to report to

another location.  The guards would repeatedly fail to show up at their posts because of

Hargrove's actions.  As a result, Marks had to cover their shifts as well as get other guards to come in at the last minute.  Marks alleges that Hargrove blamed her for the mess and caused dissension among the employees under her supervision.  Also, Marks claims Hargrove sent guards to locations they were not supposed to work because the clients had voiced that they did not want certain guards.  But Hargrove would send these guards to the prohibited sites anyway to make Marks look bad with the client.

Marks usually worked thirty to fifty hours a week at USSA; however, at Hargrove's insistence Marks worked eleven and seventeen hour shifts unlike the men security guards who worked shorter shifts.  Marks asserts that the men received preferential job assignments. Hargrove assigned the men to work in jobs with higher pay and the women received the lesser paying jobs.

When Rodriguez complained to Hargrove, Hargrove specifically mentioned names of corporate individuals in human resources who were his personal friends.  Hargrove told Rodriguez that if she called and reported him to Human Resources, Linda Kraetz, his friend in Human Resources, would tell him and he would end Rodriquez' life.  Further, Rodriguez told Marks that Hargrove had pulled a gun on her.  As a result of her fear of Hargrove, Rodriguez helped Hargrove type up false disciplinary actions and placed them in Marks' personnel file to falsely portray Marks as a deficient and bad supervisor.

Because of Hargrove's alleged retaliation and Rodriguez' statement to Marks that she had informed USSA's corporate office but nothing would be done, Marks filed an EEOC charge on January 31, 2007.  The Birmingham USSA office received notice of Marks' charge of discrimination on February 21, 2007.

Although Marks claims retaliation, USSA asserts it promoted Marks.  USSA points out that Rodriguez promoted Marks to site supervisor on August 1, 2006, after Marks initially complained to Rodriguez, her immediate supervisor.  After her promotion, Marks handled the Bi-Lo account and supervised five or six stores.  Further, Marks received a $100.00 bonus on September 26, 2006 after being named security guard of the month. Additionally, Hargrove asked Marks to work on Wednesdays when Carey Quick, the Administrative Assistant, was in school so she could learn more about the business.  The court notes, however, that these positive actions came *before* the January 4, 2007 incident and before Hargrove knew that Marks had complained.

Realizing that Rodriguez was not going do anything regarding her complaint of sexual harassment, on February 5, 2007, Marks called Tia Waller-Johnson, Vice-President of Operations, to further report and complain about Hargrove's sexually harassing her.  Three days later, Waller-Johnson sent an email regarding Marks' complaint to Debbie Givens in Human Resources.

Defendant contends that Marks stated to Waller-Johnson that she had not reported incidences of sexual harassment by Hargrove earlier because he had told her any complaints would be directed to his friend, Linda Kraetz, and no action would be taken against him. However, Plaintiff had previously reported Hargrove's harassment to her supervisor, Rodriguez. Also, Marks says that she did not write down her previous complaints she had against Hargrove for sexual harassment and turn them in to someone at corporate in accordance with the policy of the company because Hargrove had connections in upper level Human Resources.

On February 6, 2007, Marks made an "emergency call" to Givens in HR to inform her of

the complaint to Waller-Johnson the day before.  Later that evening, Marks sent an email to

Rodriguez and attached a statement she had written up.  Marks asked Rodriguez to make any

necessary changes.

On February 28, 2007, Rodriguez forwarded the email and attached statement to Waller-

Johnson, Sarnese, and Hargrove.  In her email, Rodriguez purportedly said, among other things,

that she did "not trust or support Jamie Marks in her accusations."

On March 5, 2007, Marks sent another email to Rodriguez's personal email with the

subject "All this BS!"  In the email, Marks stated in part:

> . . . I know that everyone at US now knows that I have a lawyer.  I haven't been
> contacting you cause I don't want ANYONE to have ANY grounds to say a fuckin
> thing about you or me and our relationship.  I put a whole lot of trust in you, and I
> hope that nothing has happened to change that.  I know the games have begun and
> that the mud has already started to be slung.  Ive [sic] been told a whole lot of BS
> as I'm sure you have at this point too.  Just for a lil piece of mind, things really are
> going well, Melissa . . .  As long as it stays the way we intended it to.  I've
> attached a copy again, just so you can see, if you haven't already, what I gave to
> Lisa.

In a March 5, 2007 email to Waller-Johnson and Sarnese, Rodriguez purportedly stated that she

will forward Marks' March 5, 2007 email to them.  She also allegedly says "I am beginning to

feel like I am being set up.  For the record, I am in no way affiliated with this woman.  When she

first started down this road and asked for my assistance, I told her I would help her report her

incidents if she has some form of proof.  As far as I have seen, she has none."  Plaintiff contends

that *Hargrove* authored the majority of Rodriguez' emails and then sent them to himself,

Sarnese, and Waller-Johnson under Rodriguez' name.  In fact, as described in more detail later,

Rodriguez testified that Hargrove typed emails using her name.

USSA's Response to Marks' Complaints

10

After Marks filed her EEOC complaint, USSA's attorneys hired Lisa Conover to investigate Marks' complaints.  After receiving Conover's investigation report, Sarnese and Waller-Johnson directed Hargrove and Rodriguez to travel to Atlanta for a meeting where the four of them had a discussion for several hours.  Sarnese did not believe Rodriguez because she admittedly lied several times.  According to Sarnese, during the investigation of Marks' EEOC charge, the depiction of events went back and forth and no one came up with anything to substantiate the allegations that Hargrove did anything Marks accused him of doing.  According to USSA, even though unconvinced of substantiation of sexual harassment claims against Hargrove, Sarnese has had several harsh counselings with him.

Marks' Personnel File

Plaintiff's personnel file contains many notes and written reprimands regarding Plaintiff's conduct during her employment.  Plaintiff Marks contends that USSA never provided the notes, write-ups, or written counselings to her.  Plaintiff also alleges that the documents are false and fabricated disciplinary documents placed in her personnel file at Hargrove's direction after Marks complained about Hargrove's sexual harassment.  Rodriguez confirmed that she and Hargrove fabricated these write-ups.

Other Allegations Against Hargrove During His Employment

Plaintiff offered testimony of eight former USSA female employees who allege that Defendant Hargrove sexually harassed them during their employment.  Specifically, three of the women, Donna Moler, Merdith Batchelor-Yeddo, and Daphne Essex, from the North Carolina office, reported Defendant Hargrove's harassment to USSA management *before* Marks began working for USSA.

11

While assisting with the USSA operation in Louisiana following Hurricane Katrina, at least three female USSA guards, including Moler, Batchelor-Yeddo, and Essex, accused Hargrove of sexual harassment, by way of sexually charged comments, kissing a subordinate and walking in a room as a woman was dressing.

Based on Hargrove's inappropriate conduct, Batchelo-Yeddo complained to her manager in North Carolina. Batchelor-Yeddo's manager told her that the branch office would look into the matter; however, neither her supervisor nor anyone else with the company discussed the matter with her again.

When her co-worker, Donna Moler, returned to North Carolina, she discussed the situation with one of her supervisors. Moler's supervisor, Major Howard, told her that Hargrove was no longer with USSA and not to worry about the matter any further. As a result of Major Howard's statements to Moler, neither Batchelor-Yeddo nor Moler took any further action.

Hargrove said he was innocent and the women made up the accusations. USSA contends that it immediately began an investigation following these allegations of sexual harassment; however, Plaintiff maintains that USSA did not promptly or thoroughly investigate the allegations.

Plaintiff contends that when Hargrove's supervisors, Sarnese and Waller-Johnson, learned that Jim Flowers had received three separate complaints accusing Hargrove of sexual harassment, they immediately became personally involved. Flowers wanted to suspend Hargrove immediately, but Sarnese intervened and refused. Debbie Givens investigated the allegations. At the time Givens was investigating Meredith Batchelor-Yeddo's complaint about Hargrove's sexual harassment, Waller-Johnson received Daphne Essex' complaint.

12

Sarnese conducted his own investigation and decided–without personally interviewing the victims–that Hargrove was not guilty of sexual harassment and that the women were just disgruntled.  Sarnese ultimately decided that the evidence was insufficient to conclude that Hargrove created a sexually hostile atmosphere or engaged in other forms of sexual harassment.

Based upon his analysis of the investigation results, Sarnese did not believe the allegations constituted sexual harassment.  USSA contends that despite his belief that the allegations did not amount to sexual harassment, Sarnese and Waller-Johnson verbally counseled Hargrove about the allegations and future behavior; however, Hargrove stated that he was not reprimanded or required to take any kind of sexual harassment training as a result of the allegations.  Nevertheless, the complaints by these three women in North Carolina and Plaintiff Marks are bolstered by complaints of similar harassment made by five other female employees.

<u>The Rodriguez Confirmation</u>

Melissa Rodriguez also filed a charge of discrimination and harassment against Hargrove after she tried to end their relationship.  Rodriguez stated that several females had been sexually harassed and had complained to her.  Rodriguez also stated that in the beginning when Marks complained to her, she was scared to say anything because of the relationship she and Hargrove were having.  She also stated that Hargrove forced her to lie to the investigator and that Hargrove sat at Rodriguez' desk and typed emails with her name on them.  He also authored false disciplinary actions against Marks and other females.

Rodriguez claims that Hargrove also fabricated the disciplinary action of Larry Wall and a drug test.  Rodriguez claims Hargrove was setting Wall up for failure after Wall received complaints from his daughter about Hargrove's sexual harassment.  Plaintiff alleges that this

13

manipulation of drug tests and disciplinary actions was so that Hargrove could protect himself

from the allegations of sexual harassment.  Plaintiff alleges that Hargrove's fabrication was an

attempt to portray Wall as an untrustworthy and disgruntled employee.

USSA's Anti-Harassment Policies and Procedures

USSA provides the Administrative Management handbook to managers, including

Operations Managers and District Managers.  The Administrative Management Handbook

contains USSA's anti-harassment and anti-retaliation policies.  Also, USSA has formal

management training on different topics with live speakers.

In its employee kitchen, Defendant USSA maintained a bulletin board that displayed

administrative contact information, including names, telephone and fax numbers for USSA's

Human Resources Department (HR) and CEO.  The bulletin board displayed this information

while Plaintiff Marks worked for USSA.  Since July 6, 2006, a poster regarding sexual

harassment and how to report it has been on the USSA Uniform Room door.

Defendant USSA asserts that its policy is to provide an Officer's Guide, which also

contains the sexual harassment policy, to each security officer employee it hires.  The sexual

harassment policy is the same for both management and security officers.  The policy provides

the procedure for reporting sexual harassment and the direct telephone number for Givens.  The

policy instructs employees to report sexual harassment to 1) her immediate supervisor, 2) the

district/branch manager, *or* 3) the EEO officer.  Each new security officer signs the receipt at the

back of the book to indicate they received a copy and it goes into his or her file.

Plaintiff contends that USSA did not implement, follow, or enforce its policies.

Furthermore, the parties dispute whether USSA advises security officer employees of the sexual

harassment and retaliation policy by giving them the Security Officer's Guide and having them watch about a thirty-minute segment in the security officer basic training video that covers sexual harassment and other forms of discrimination.

As a result of the Defendant USSA's actions and inactions, Marks claims she has suffered emotional and physical injury.  She claims the Defendants have shaken her self-confidence and outlook for a successful job.  Further, her experiences while employed by USSA have affected Mark's relationship with men generally, and specifically with her husband.

**Standard of Review**

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; *and if not*, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support

15

its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on the pleadings. *Celotex*, 477 U.S. at 324.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

## Discussion

Plaintiff has brought claims of sexual harassment; gender discrimination; retaliation; negligent hiring, training, supervision and retention; invasion of privacy; and outrage. Much of USSA's argument in support of summary judgment on Plaintiff's claims rests on the assertion that USSA is not directly or vicariously liable for the alleged actions of Defendant Hargrove; however, Plaintiff has shown genuine issues of material fact as to both types of liability.

An employer can be directly liable for the acts of an individual employee when 1) the combination of the employer's knowledge and inaction demonstrate negligence or the adoption of the offending conduct; 2) the individual employee charged with harassment or discrimination is sufficiently high in the management hierarchy of a company so as to impute liability to the

employer; *or* 3) the individual causes discriminatory tangible employment action. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789-90 (1998).  In this case, Plaintiff Marks presents genuine issues of fact related to all three bases for finding direct liability.

For example, Defendant USSA asserts that it is not directly liable under the second basis because no management-level individual at USSA intended harmful conduct to occur.  However, Plaintiff presents evidence that Defendant Hargrove was the highest-level manager for USSA in the entire state of Alabama.  Viewing the evidence in the light most favorable to Marks, the court cannot accept USSA's conclusion that Hargrove was not a management-level individual whose actions confer direct liability.  Plaintiff also presented evidence that USSA knew of Hargrove's conduct and took no action, and that Hargrove's action caused an adverse tangible employment action, thus subjecting it to an alternative basis for direct liability.  Therefore, summary judgment on the issue is inappropriate because Plaintiff has presented a genuine issue of material fact as to USSA's direct liability.

As to indirect liability, the Supreme Court stated that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." *Faragher*, 524 U.S. at 807.  Again, Plaintiff presented genuine issues of material fact as to whether Hargrove, her supervisor, created a hostile work environment and subjected her to adverse tangible employment action–constructive discharge.

Further, USSA cannot avail itself of either *Faragher* affirmative defense of 1) exercising reasonable care to prevent and promptly correct any sexual harassment behavior or 2) showing that

Marks unreasonably failed to take advantage of USSA's anti-harassment policy. *See* 524 U.S. at 807. Marks has presented sufficient evidence raising genuine issues of material facts as to whether USSA reasonably responded to complaints about Hargrove's harassment.  Also, the evidence shows that Marks followed the stated sexual harassment policy–she reported the harassment to her immediate supervisor, Rodriguez.  Therefore, summary judgment on the ground that USSA is not indirectly liable for the actions of Defendant Hargrove is not appropriate.

Sexual Harassment

 To establish a sexual harassment claim under Title VII, an employee must show:

> (1) that she belongs to a protected group, (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature, (3) that the harassment must have been based on the sex of the employee, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) a basis for holding the employer liable.

*Corbitt v. Home Depot U.S.A., Inc.*, 573 F.3d 1223, 1239 (11th Cir. 2009).  Defendant USSA argues that it is entitled to judgment as a matter of law because Plaintiff has not shown a genuine issue of material as to the fifth element.  However, as discussed above, Plaintiff has shown multiple genuine issues of material fact as to whether USSA is directly or indirectly liable for Hargrove's alleged harassment.  Thus, summary judgment on the sexual harassment claim is inappropriate.

Gender Discrimination and Retaliation

 To establish a *prima facie* case of gender discrimination, a plaintiff must show that she (1) is a member of a protected class; (2) was subjected to adverse employment action; (3) had an

employer who treated similarly-situated employees more favorably; and (4) is qualified to do the job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  The parties do not dispute that Marks is a woman and was qualified for her job.  They do disagree, however, as to whether USSA subjected Marks to an adverse employment action or treated her less favorably than similarly situated male employees.

First, USSA claims that it is entitled to judgment as a matter of law because Marks did not suffer an adverse employment action; however, Marks essentially alleges constructive discharge, which is an adverse employment action.  To prove "constructive discharge," an employee must demonstrate that her working conditions were so intolerable that a reasonable person in her position would be compelled to resign. *Kilgore v. Thompson & Brock Mgmt, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).  Taking the evidence offered by Plaintiff as true–as the court must do at this stage–*at the very least*, Plaintiff has raised many genuine issues of fact as to whether she was subjected to intolerable working conditions that effectuated a constructive discharge.

Second, "[i]n determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in . . . the same or similar conduct and are [treated] in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  Defendant USSA asserts that Plaintiff has not presented any evidence to meet the similarly situated requirement; however, Plaintiff testified that while she was a security guard, USSA required her to work eleven and seventeen hour shifts unlike the other male guards who worked shorter shifts.  Further, Plaintiff testifies

that male guards received preferential job assignments that had better working conditions and higher pay.  At the summary judgment stage, Plaintiff's testimony is sufficient to withstand Defendant's motion for summary judgment on her gender discrimination claim.

To prove retaliation under Title VII, the plaintiff must show "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Andrews-Willmann v. Paulson*, 287 Fed. App'x 741, 746 (11th Cir. 2008) (quotation omitted).  Defendant USSA contends that it is entitled to summary judgment because Plaintiff has not provided evidence as to the second and third elements.  However, viewing the evidence in a light most favorable to Marks, the court finds genuine issues of fact as to both elements.  As previously mentioned, Marks has shown that she was subject to constructive discharge–an adverse employment action.  Furthermore, she testified that shortly after complaining to Rodriguez about Hargrove's harassment and setting up a plan that caught Hargrove in the act of harassment, her work conditions became intolerable. Thus Marks has shown causation by producing evidence of 1) Hargrove's knowledge of her complaints and 2) close proximity between his knowledge and her constructive discharge. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  Hence, Marks has sufficiently shown a causal connection between her complaints and her constructive discharge.

USSA is not entitled to summary judgment as to Marks' retaliation or gender discrimination claims because, as contained in the statement of facts, Marks has shown genuine issues of material fact; therefore, USSA is not entitled to judgment as a matter of law.

Negligent Hiring, Retention, Training, and Supervision

Plaintiff has presented evidence that Defendant Hargrove, while working for previous

employers, sexually harassed women.  Plaintiff alleges that had USSA performed a thorough investigation, USSA would not have hired Hargrove, and she would not have suffered harassment at his hands.  USSA maintains that it conducted a reasonable investigation before hiring Hargrove by performing a criminal background check and checking his prior employment dates; however, USSA's stance only serves to present another issue of fact that a jury must determine–whether its pre-hiring investigation was reasonable.

Further, Plaintiff alleges negligent retention because Hargrove allegedly abused her *after* USSA had notice of sexual harassment complaints from other female USSA employees.  Again, USSA maintains that it conducted a reasonable investigation after it received the complaints; however, whether the investigation was reasonable  is a question of fact that the court will not resolve on summary judgment.

Finally, Plaintiff alleges that USSA negligently trained and supervised Hargrove.  USSA asserts that it adequately trained Hargrove in many areas, including sexual harassment. Nevertheless, given the extensive evidence presented by Plaintiff Marks of Hargrove's inappropriate conduct with at least half a dozen women, the adequacy of this training is a question that a jury must answer.

Invasion of Privacy and Outrage

Defendant USSA moves for summary judgment as to the invasion of privacy and outrage claims because Plaintiff has not established facts supporting the elements of each tort and because Plaintiff did not put USSA on notice of the commission of the torts.  Defendant does not explain which elements Marks failed to prove, but rather argues that USSA did not ratify Hargrove's alleged tortious activity.  Ratification is required where the Plaintiff cannot show

direct liability, *see Machen v. Childersburg Bancorp., Inc.*, 761 So. 2d 981, 984-85 (Ala. 1999); however, Plaintiff has presented evidence that USSA can be found directly liable for Hargrove's actions. Thus, Plaintiff is not required to show ratification.

Nevertheless, Plaintiff has presented facts that show USSA ratified Hargrove's acts by failing to adequately respond to multiple complaints of Hargrove's alleged harassment. Thus, Plaintiff has further shown genuine issues of material fact as to her invasion of privacy and outrage claims.[2]

### Conclusion

In many sexual harassment cases, the evidence devolves into a state of "he said/she said." Such different versions of what transpired often create genuine issues of material facts and defeat summary judgment. This case, however, is not the typical case.

Here, Marks presented not only her version of what occurred in private between her and her supervisor Hargrove; she also presented the testimony of eight other women with remarkably similar accounts of their encounters with Hargrove. In addition, she also presented testimony from her immediate supervisor who caught Hargrove "in the act," and who confirmed that Hargrove falsified documents in Marks' personnel file to undermine her authority and job performance.

Further, Marks has gathered evidence that Hargrove left behind him a legacy of sexual

---

[2]The court notes that the Alabama tort of outrage requires strenuous proof. *See Thomas v. B.S.E. Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993) ("[O]utrage is a very limited cause of action that is available only in the most egregious circumstances."). However, a jury could find in this case that Defendants engaged in egregious conduct, thus meeting the standard of "go[ing] beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981).

harassment at two prior employers.  Even more disconcerting is what few steps USSA took to protect its female employees from Hargrove's proclivity when it began receiving complaints about his conduct.

To state the obvious, Plaintiff has provided more than a sufficient amount of evidence to show many disputed issues of material fact regarding her claims and to defeat summary judgment.  For this reason, the court DENIES Defendant's Motion for Summary Judgment. DONE and ORDERED this 26th day of October, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE