**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **JAMIE KOHSER MARKS,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ]    **CV-08-BE-0459-S** |
| | ] |
| **U.S. SECURITY ASSOCIATES, INC.** | ] |
| **and CHRIS HARGROVE,** | ] |
| | ] |
| **Defendants.** | ] |

**MEMORANDUM OPINION**

This sexual harassment matter comes before the court on Defendant U.S. Security

Associates, Inc.'s Alternative Motion for Remittitur (doc. 231);[1] "Defendant U.S. Security

Associates, Inc.'s Rule 59(e) Motion to Alter or Amend the Judgment" (doc. 233); and on

Defendant Hargrove's Alternative Motion for Remittitur (doc. 236).[2]  The parties have fully

briefed the motions.  The court has considered the oral arguments and submissions of counsel

and the applicable law.  Although the court stated on the Record at the May 25, 2010 hearing its

intent to remit damages awarded against USSA for the state law claim, upon further

consideration, for the reasons stated below, the court will grant Defendant USSA's Motion to

Alter or Amend (doc. 233) to the extent of applying statutory caps, but will deny Defendant

USSA's Motion for Remittitur (doc. 231); and will deny Defendant's Hargrove's Motion for

---

[1] The court previously denied Defendant U.S. Security Associates, Inc.'s motion as to
judgment as a matter of law and new trial; the court reserved ruling on the remittitur issue. (*See*
doc. 269.)

[2] The court previously denied Defendant Hargrove's motion for new trial, but reserved
ruling on the alternative motion for remittittur.  (*Se*e doc. 270.)

1

Remittitur (doc. 236).

The major issue in these motions centers on whether the jury's award of $200,000 in total compensatory damages and $2,500,000 in total punitive damages against both Defendants reflects the appropriate measure of damages recoverable by Ms. Marks.  The jury listened to almost three weeks of testimony concerning what it obviously found to be a workplace run amuck.  The evidence presented convinced the jury of the truthfulness of Ms. Marks's claims and demonstrated that USSA valued its big-dollar producer to such an extent that it swept under the rug allegations of inappropriate conduct by Hargrove, giving him free rein to prey on women over whom he exercised almost unfettered authority.  USSA's cavalier attitude toward sexual harassment in the workplace coupled with Hargrove's demonstrated proclivity for sexual harassment of vulnerable women under his supervision provided the perfect storm for the most egregious case of sexual harassment, retaliation, and tortious conduct that has been tried in this court.  The amount of the verdict, though large, is not as shocking as the conduct it seeks to rectify.  Therefore, after applying the statutorily mandated caps to the punitive damage awards, the court declines to tamper further with the jury verdict.

I.      Jury Awards and Statutory Caps

        A.      Title VII Damages

        In a bifurcated process, the jury returned a verdict in favor of Ms. Marks against USSA for sexual harassment and retaliation under Title VII.  The jury then apportioned damages at $30,000 for sexual harassment; $1,600 as lost wages[3] and $18,400 as other damages for

---

[3]The Plaintiff limited her claim for backpay because soon after her constructive discharge she learned she was pregnant.  The complications of that pregnancy caused her to be confined to bed and unable to work.

retaliation; and $200,000 as punitive damages for each of the two Title VII claims.

One of the very few things on which the parties agreed throughout this contentious litigation was that the Title VII damages are subject to the statutory cap of $300,000, plus $1,600 for lost wages[4] pursuant to 42 U.S.C. § 1981a(b)(3)(D).  The statute does not provide a method for adjusting the jury award of different damages to the maximum $300,000 amount.  Some courts have applied a pro rata reduction of compensatory and punitive damages; other courts take the entire reduction from punitive damages.  *See Lust v. Sealy, Inc.*, 383 F.3d 580,589 (7th Cir. 2004) (discussing different approaches and opining that the "sensible thing" to do is to determine the maximum compensatory award, subtract that from the $300,000 cap and allow the difference to stand as punitive damages); *Mendez v Perla Dental*, 2008 WL 821882 (N.D. Ill.) at *5.  The court finds that the appropriate manner for reducing those damages leaves the compensatory damages intact and reduces the punitive damages to bring the total award to $300,000. Therefore, the punitive damages for both sexual harassment and retaliation will be reduced from $200,000 to $125,800 on each claim, for a total award for the Title VII violations of $300,000, plus $1,600 as lost wages.

After reducing the punitive damages awarded to comport with the statutory cap, the court finds that the total award of $48,400 in compensatory damages and $251,600 in punitive damages, plus $1,600 for lost wages, is appropriate under the facts and evidence of the case. Therefore, the court will not reduce the Title VII award further.

---

[4] Lost wages are specifically excluded from the statutory cap on damages.  42 U.S.C. § 1981a(b)(2).

B.      State Law Damages

      1.      Defendant Chris Hargrove

On Ms. Marks's state law claims, the jury found Hargrove liable for $20,000 in damages for intentional infliction of emotional distress; $20,000 for assault and battery; and $10,000 for invasion of privacy.  The jury also awarded a total of $100,000 in punitive damages on those three claims against Hargrove: specifically, the jury awarded as punitive damages $50,000 for intentional infliction of emotional distress; $30,000 for assault and battery; and $20,000 for invasion of privacy.

      As discussed at the hearing on these motions, the court finds that the damages assessed by the jury against Hargrove are reasonable under the circumstances and evidence presented in this case.  His outrageous conduct could easily support a punitive damage award in excess of twice the compensatory damages awarded here, if not more.  The fact that the punitive damage award was not larger reflects the seriousness with which the jurors took their job.  They were not motivated by prejudice or passion and followed the court's instruction that they could consider the wealth of the defendant in assessing punitive damages.  The punitive damage award is less than 1.2 times Hargrove's annual salary from USSA of $85,000.  Considering the egregious nature of his conduct, this award is not out of line.  Therefore, the court will deny Hargrove's request for remittitur without further discussion.

      2.      Defendant U. S. Security Associates, Inc.

      As to the supervision/retention claims against USSA, the jury found that Ms. Marks's contributory negligence defeated her claim for *negligent* supervision.  It returned a verdict in her favor, however, for *wanton* supervision/retention and it assessed $100,000 as compensatory

damages and $2,000,000 as punitives.  Again the parties agree that the Alabama statutory cap applies to reduce the punitive damage award to $500,000; as adjusted for inflation pursuant to the statute, that amount becomes $646,167.46.  *See* Ala. Code § 6-11-21(a), (f).  The court, therefore, will limit the punitive damages for this state law tort as required by Alabama law to $646,167.46.

II.    Remittitur

The more difficult question becomes whether the court should grant USSA's request for remittitur beyond the statutory reductions.  At the hearing, the court expressed its intention to do so as to both the compensatory and punitive damages awarded for wanton supervision.  However, further review of the Record and research does not provide any basis for doubting that the jurors failed to follow the court's oral instruction that Ms. Marks could only recover one time for her damages (Tr. 4069-70); or its instruction that they "should be guided by dispassionate common sense" and not base the damage award on "sympathy, speculation, or guess work."  (Tr. 4063,)

The jurors selected in this case were not the kind generally thought to be inclined to recklessly return large verdicts.  The eight jurors were well educated: four held college degrees, two had associate degrees, and two graduated from high school.  Their diverse employment including banking, patient accounts manager, account manager, department manager, software engineer, project director, minister of music, and meat cutter.  They paid close attention to the testimony, indicated they understood the court's limiting instructions about certain evidence, took notes throughout the trial, and demonstrated their understanding of the jury instructions in the way they completed the two verdict forms submitted to them.  Those completed forms are attached to this opinion as an Appendix.

The evidence supports the jury's finding that Ms. Marks suffered great emotional distress

at the hands of her boss and her employer, as discussed more fully subsequently; that Alabama

law supports the jury's award; and that the total amount of punitive damages, after applying the

two statutory caps, appropriately reflects the reprehensibility of USSA's conduct.  Therefore, the

court exercises its prerogative to change its mind in deference to the collective wisdom of the

men and women who took seriously their duties as jurors on this case and to Alabama law

concerning the appropriate measure of damages.

 A.  Compensatory Damages - Emotional Distress for Wanton Supervision/Retention

 USSA challenges the jury's award of $100,000 for compensatory damages as not

supported by the evidence and as  duplicative of the other compensatory damages awarded. The

essence of Ms. Marks's damages for all her claims was the mental anguish she suffered because

of the co-occurring actions of these Defendants.  The court instructed the jury that it could not

award monetary damages more than once for the same injury, but they should allocate damages

among the various claims.  (Tr. 4069.)  The court accepts that the jury followed its instructions.

 The determination of the value of non-economic damages is placed within the sound

discretion of the collective wisdom of the trial jury. Thus, "[t]he standard of review for awards of

compensatory damages for intangible, emotional harm is deferential to the fact finder because the

harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Bogle*

*v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003) (quotation marks and citation omitted). That

said, the measure of damages awarded should bear some relation to the actual evidence offered at

trial.  Ms. Marks presented testimony from herself, from her estranged husband (by deposition),

and from at least one former co-employee as to the mental anguish she suffered while employed

with USSA that continued subsequent to her constructive discharge.  Observing the "demeanor

of the witnesses," the jury believed Ms. Marks's evidence, as it was entitled to do, and found that she suffered substantially at the hands of the Defendants.

          1.         Alabama standard for evaluating emotional damages

As a federal court reviewing a compensatory damage award on a state law claim, the court must examine the propriety of the award under Alabama law.  *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1212 (11th Cir. 2010).  Regarding an award of compensatory damages for mental anguish, the Alabama Supreme Court has stated:

> [A] plaintiff may recover compensatory damages for mental anguish, even when mental anguish is the only injury visited upon the plaintiff. . . .  Once the plaintiff has presented some evidence of mental anguish, the question whether he should recover for such mental anguish, and, if so, how much, is a question reserved for the jury. . . .  A jury's verdict is presumed correct, and that presumption is strengthened upon the trial court's denial of a motion for new trial. . . . On the other hand, that presumption is weakened and we strictly scrutinize such a verdict when a plaintiff who claims damages solely for mental anguish fails to offer his own testimony of the mental anguish he has suffered. . . .
>
> Despite our great deference to the jury's award of compensatory damages for mental anguish, we have not hesitated to remit such damages where the plaintiff has produced little or no evidence indicating that he has suffered such mental anguish. . . . The inquiry is not whether traumatic events have occurred, but whether the plaintiff has actually suffered as a result of those events. 832 So. 2d at 37. When a plaintiff's testimony amounts to little more than the obvious notion that dealing with the traumatic event was 'hard' or 'humiliating,' we have consistently remitted damages. *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 837 (Ala. 1999). Additionally, when a plaintiff testifies merely that he suffered 'a lot' of mental anguish, we have similarly remitted damages. *Oliver v. Towns*, 770 So. 2d 1059, 1061 (Ala. 2000); *Foster v. Life Ins. Co. of Georgia*, 656 So. 2d 333, 336-37 (Ala. 1994).

*Slack v. Stream*, 988 So. 2d 516, 531-32 (Ala. 2008) (quoting *George H. Lanier Mem'l Hosp. v.*

*Andrews*, 901 So. 2d 714, 725-26 (Ala. 2004)) (some citations omitted) (emphasis added).

In *Slack*, the Alabama Supreme Court upheld the $200,000 award for mental anguish for the defamation claim of a former university professor wrongly accused of plagiarism. As a result of the dissemination of a letter of reprimand to other universities and academic journals, and a phone call by the department chairman to the department chair at another university where the professor had been offered a new position, the professor lost the opportunity to earn $12,000 to teach during the summer term at the other university, his reputation was significantly tarnished, and he presented substantial evidence of emotional distress. He testified about being worried about losing his new job, being embarrassed and ashamed of being accused of "intellectual theft," being isolated and ostracized by other faculty members, and obsessing over the incident for two years. In addition, he presented testimony from his wife concerning the strain placed on their marriage, their arguments, and the anguish she observed seeing her husband crying and depressed. A professor from another university to whom the letter was sent testified that "the damage caused to an academician's reputation caused by an accusation of plagiarism is 'extreme and it takes years and years and years to overcome. . . .'" 988 So. 2d at 532-33. Another professor corroborated the plaintiff's isolation by testifying that plaintiff was considered to be "an academic leper" and other faculty members avoided him. 988 So. 2d at 523. A student testified that the accusation of plagiarism against the professor was "one of the biggest things" discussed among students that semester. 988 So. 2d at 524. Based on all this evidence and more, the Court found that plaintiff provided sufficient evidence of mental anguish to support the jury award of $200,000. 988 So. 2d 533.

By contrast, in the *Oliver* case, the Court found the award of $492,800 for mental anguish

was not supported by the evidence and reduced the award to $75,000.  *Oliver v. Townsend*, 770

So. 2d 1059, 1061 (Ala. 2000).  That case involved a financial loss of $7,200 when an attorney

misappropriated the proceeds of a client's settlement check.   The evidence concerning the mental

anguish came from the client's testimony that she suffered "a lot" of mental anguish and had to

seek counseling, but nothing from a counselor substantiated her claim.  In finding that the client

"simply did not present enough evidence to support" the award, the Court specifically noted the

actual monetary damage amount of $7,200, and reduced the total compensatory damage award

from $500,000 to $75,000.  770 So. 2d at 1061.

Similarly in *Delchamps, Inc. v. Bryant*, a case of malicious prosecution, the Alabama

Supreme Court ordered a remittitur of compensatory damages from $400,000 to $100,000; those

damages included an actual monetary loss of $700 in attorneys fees paid to defend the shoplifting

charge.  738 So. 2d 824, 838 (Ala. 1999).  In that case, the Court found that the plaintiff "gave

scant direct testimony about mental anguish."  *Id.*  During the two months between the time of his

arrest and the dismissal of his case, the plaintiff testified he was concerned about returning to jail

for ten years if he were convicted.  The Court noted that the mental anguish was of limited

duration – two months – and that the plaintiff presented no corroborating evidence.  "The absence

of evidence to corroborate [plaintiff's] description of the intensity of his suffering, i.e., evidence

referring to quantifiable effects, whether from [plaintiff] himself, from family members or from a

professional, leads us to conclude that the jury abused its discretion in awarding $400,000 in

compensatory damages."  738 So. 2d at 838.

These cases demonstrate that "a plaintiff must present a significant amount of evidence to

show the effects of the mental anguish before she can receive a mental-anguish award measured in

the hundreds of thousands of dollars." *Oliver*, 770 So. 2d at 1061.  Although the Alabama

Supreme Court has "worked diligently . . . to formulate a consistent law regarding the amount of

damages that can be awarded for mental anguish," *Oliver*, 770 So. 2d at  1061, determining that

magic amount still cannot be a precise determination.  In cases where the Alabama Supreme Court

reduced damages for mental anguish based on insufficient evidence to support the jury award, the

Court gave little or no explanation as to the reason for the dollar amount it chose.  *See Bryant*, 738

So. 2d at 838 ("We believe the greatest amount of compensatory damages a jury, using sound

discretion and guided by proof sufficient to warrant an award of such damages, could have

awarded [plaintiff] based on the evidence is $100,000."); *Foster v. Life Ins. Co. of Ga.*, 656 So. 2d

333, 337 (Ala. 1994) ("Foster's scant testimony of mental anguish and emotional distress, without

more, does not support an award exceeding $120,000 for each of the two months before she sued.

We conclude that the $250,000 compensatory damages award [which included $2,500 in actual

damages] was excessive by $200,000."); *Oliver*, 770 So. 2d at 1061 (". . . we see no reason why

the compensatory damages in this case [including $7,200 actual damages] should exceed

$75,000.").  At best, all this court can try to do is compare the extent and significance of the

evidence presented by Ms. Marks to support her claim of emotional distress damages with the

quantity and quality of similar evidence in other cases, and then compare the $100,000 award in

this case to awards either affirmed by or ordered remitted by the Alabama Supreme Court.

       2.      Application of Alabama Standard

The jury who heard all the testimony, observed the demeanor of the witnesses, reviewed

the exhibits, studied and followed the court's instructions about awarding mental anguish

damages according to Alabama law,[5] determined that Ms. Marks presented sufficient evidence to justify an award of $100,000 against Defendant USSA, in addition to the $50,000 in emotional distress damages it awarded her against Defendant Hargrove, for her state law tort claims.  The court also notes that Ms. Marks not only offered her own testimony regarding her mental anguish damages, but also the deposition testimony of her husband, and the live testimony of her co-worker, Lisa Parvin.

As to effects of Mr. Hargrove's requests of her, his lewd and crude language, and his inappropriate treatment of her, Ms. Marks testified that Hargrove's conduct made her feel "[v]ery self conscious, wondering what I did to make him approach me that way.  It had me questioning everything about myself"; she felt "[v]ery unsure, lost self esteem, everything was messed up." (Tr. 2366.)  She further testified, "I was not sleeping, I was not eating.  It affected my relationship with my husband . . . .  I basically couldn't have any kind of intimate relationship with him."  (Tr. 2367; see also Tr. 2547-48.)  She astutely explained on cross examination that "[w]hat I mean by that is for me, in my part, an intimate relationship with my husband is different than just having sex. . . . Intimacy, being able to express my feelings for him."  (Tr. 2557.)  She further stated that "The things that Mr. Hargrove did to me and the way he made me feel didn't just go away when I wasn't in his presence."  (Tr. 2558.)  She and her husband had been married for eleven years, but at the time of trial, she had filed for divorce.  Prior to the issues with Hargrove, the issues she and her husband had were primarily financial.  Although she does not claim the divorce resulted from Hargrove's actions, she does believe it contributed to the demise of her marriage because of the

---

[5] In instructing the jury, the court followed the Alabama Pattern Jury Instructions.  The court provided the jury with copies of the written charge.

effect Hargrove's actions had on her.  (Tr. 2558-59.)  As a result of the experience with Mr.

Hargrove, she had trouble looking for a job because she did not want to be in a position of

working directly with a man as an authority figure.  (Tr. 2563.)

During cross-examination, Mr. Hargrove's attorney offered a medical record that had been

the subject of a defense Motion in Limine.  The court had previously ruled that the *Plaintiff* could

not offer such exhibit.  In response to questions about information on Defendant's Exhibit 505,

Ms. Marks testified that when she marked on that medical form that she had been mentally abused

and sexually abused she meant by Hargrove.  (Tr. 2559-60.)  She also indicated on that form that

she was currently depressed and had overwhelming anxiety and mood swings, and she testified

that she attributed those conditions to Hargrove's actions.  (Tr. 2578-79.)  (Defendant's Exhibit

505 is dated July 2, 2007.)

Ms. Marks and other women testified about Hargrove's pervasive use of gender-specific,

derogatory words when addressing them or referring to other women.  The Eleventh Circuit

recently discussed the impact of the words, like Hargrove used, such as "bitch" and "whore" and

found them to be "humiliating and degrading."  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594

F.3d 798, 810-11 (11th Cir. 2010).  The humiliation inherent in such words when directed at

women in the workplace supports the jury's finding of extensive emotional distress.

Numerous female employees testified concerning the derogatory sexual language

Hargrove used when addressing them or when referring to other women.  The following few

references are merely illustrative: Ms. Marks testified she heard Hargrove refer to Ms. Rodriguez

as a "stupid bitch" (Tr. 2285) and referred to Tia Johnson-Waller from USSA's headquarters as

"that bitch Tia."  (Tr. 2289)  Nakeya White testified Hargrove told her he "liked his dirty little

black bitch" (Tr. 1181); Melissa Rodriguez testified about Hargrove's use of "bitch," "stupid

bitch," "f...king bitch," "slut," and "whore" in referring to her and other women (Tr. 1545, 1551,

1552, 1664, 1665).

Lisa Parvin, a co-worker of Ms. Marks, testified to one occasion when she was in the

office with Ms. Marks and Hargrove called her on the phone.  Hargrove yelled at Ms. Marks so

loudly that Ms. Parvin could hear him through the phone.  She heard him yelling "stupid bitch"

and "mother fucker."  After the phone call, Ms. Parvin observed that Ms. Marks was "shooken

up," "tearing up," "just shaking," and "upset."  Hearing the phone call upset Ms. Parvin also.  (Tr.

2852-53.)  Ms. Marks's husband, Jessie Marks, testified via deposition that although she had

experienced anxiety before 2006, she had not been anxious to the extreme it reached while she

worked at USSA.  (Tr. 3814.)

The jury found credible the testimony offered by Ms. Marks as to her emotional distress

damages.  But this court must somehow determine whether that credible evidence sufficiently

justifies the $100,000 awarded against USSA for wanton supervision in addition to the $50,000

awarded against it for sexual harassment and retaliation under Title VII, and the $50,000 awarded

against Hargrove for outrage, assault and battery, and invasion of privacy – all for intangible

injury.  The court instructed the jury that it could only award one recovery for Ms. Marks's

damages but could apportion that amount among claims and Defendants.  (Tr. 4069-70.)  Absent

any evidence to support a contrary conclusion, the court will accept that the jury followed its

instructions and that the $100,000 the jury awarded as mental anguish for USSA's state tort

liability reflects the jury's determination of appropriate damages for that separate tort.  *See Tang*

*How v. Edward J. Gerrits, Inc.*, 961 F.2d 174, 179 (11th Cir. 1992) ("[T]he jury is presumed to

follow jury instructions").

The evidence of emotional distress damages presented by Ms. Marks certainly exceeds that found insufficient by the Alabama Supreme Court to sustain a $492,800 jury award in *Oliver* or a $400,000 award in *Bryant* or the $250,000 award in *Foster*.  In *Oliver* the Court noted that the actual financial loss the plaintiff sustained was $7,200 and reduced the total compensatory damage award, including mental anguish to $75,000.  *Oliver*, 770 So. 2d at 1061.  Similarly, in *Bryant*, the Court noted the actual monetary loss was $700 and that the plaintiff's mental anguish lasted only two months; it then reduced the compensatory damages from $400,000 to $100,000.  *Bryant*, 738 So. 2d at 838.  Again, in *Foster*, the Court looked at the amount of actual damages – $2,500 – and a two month time period of emotional distress when it reduced the total compensatory damage award of $250,000 to $50,000.  From these and other cases comes the observation that somewhere within the unarticulated Alabama standard lurks a comparison of actual monetary damages, the time period during which the plaintiff suffered mental anguish, the quantity and quality of testimony corroborating the emotional distress, and the amount of mental anguish damages the Alabama Supreme Court will let stand.

In contrast to the brief periods of emotional distress experienced by the plaintiffs in *Bryant* (two months) and *Foster* (two months), Ms. Marks's emotional distress spanned *at least* eleven months during which USSA, through the actions of its unsupervised state director Hargrove, subjected her to more than thirty occurrences of unwanted touching, repeated sexually-charged statements, and requests for various sexual performances from her.  (*See*, *e.g.*, Tr. 2289-91, 2363-65, 2399-2400, 2410-11.)  Ms. Marks sought recovery of the emotional distress effects of that conduct until April 2009, for a total of approximately three years of emotional distress.  Even

14

discounting her claim for emotional distress subsequent to her departure from USSA, the *eleven months* she suffered emotionally while at USSA far exceeds the time periods noted in the cases in which the Alabama Supreme Court reduced the damage award.

As to actual damages, Ms. Marks did not present any evidence of actual monetary loss sustained as a result specifically of USSA's wanton failure to supervise Hargrove.  Her only monetary damage claim was $1,600 as back pay for the Title VII violations.  The lack of actual damage for this precise claim, however, does not automatically defeat a plaintiff's claim for emotional distress damages, but it is a factor to consider.  For example, in *Alabama Power Co. v. Harmon*, the Court affirmed a jury award of $75,000 for emotional distress over a ten-month period *without any evidence of actual monetary loss* and without any evidence of physical symptoms.  483 So. 2d 386, 389 (Ala. 1986).  Ms. Marks's evidence supporting her claim of emotional damages exceeded that discussed in *Harmon* in quantity, quality, and duration.

The evidence presented by Ms. Marks also exceeded the evidence of emotional distress found in *Bryant*.  As noted, the Court reduced the damages to $100,000 for two months of mental suffering and $700 in actual damages.  738 So. 2d at 838.  The $100,000 awarded in *Bryant* by the Alabama Supreme Court indicates that the $100,000 awarded by the jury in this case for eleven or more months of emotional distress stands on firm ground and should not be disturbed.

In contrast, the plaintiff in *Slack* lost the opportunity to earn $12,000 as a result of the defendant's defamation, but in upholding the jury's award of $200,000 for mental distress, the Court barely mentioned the actual damage amount in passing.  988 So. 2d at 531.  While the corroboration of Professor Slack's mental anguish may have been stronger in his case, the affirmance of a $200,000 award in deference to the jury in that case lends support to

15

appropriateness of the $100,000 awarded here.

A recent Eleventh Circuit case, although applying Florida law, lends instruction to this imprecise exercise. In *Myers v. Central Florida Investments*, the Eleventh Circuit affirmed a jury verdict of $103,622.09 in compensatory damages and $506,847.75 in capped punitive damages arising from a state law battery claim. 592 F.3d 1201, 1205 (11th Cir. 2010). That case had also involved allegations of sexual harassment of the plaintiff by her boss that were found to be barred by the statute of limitations. *Id.* at 1210. Unlike Alabama, Florida law provides a five-factor statutory test to aide courts in evaluating the propriety of a jury award. *Id.* at 1211; Fla. Stat. § 768.74(5).

In evaluating the propriety of the emotional distress award that approximated Myers's annual salary, the Eleventh Circuit commented that "[a] plaintiff's income is relevant insofar as it affords some indication, however, imprecise, of the costs imposed on an employee whose time in the workplace is inundated and spoiled by a defendant's behavior." 592 F.3d at 1213. The Court also noted that because "this battery involved a boss plainly taking advantage of his employee over an extended time frame, *we can tolerate damages which may be higher than normal*." *Id.* at 1214 (emphasis added). The Court thus found that "[t]his compensatory damage award of a little over $100,000 is not so great as to bear no reasonable relation to the damages she suffered." *Id.*

Similarly, Ms. Marks suffered from a boss taking advantage of her in the workplace over an extended period of time. Unlike Myers, though, Ms. Marks did not earn a large annual salary that could serve as some measure of how she valued her time at work. *See Myers*, 592 F.3d at 1213. Ms. Marks earned less than $35,000 a year. Instead, Ms. Marks presented a financially vulnerable employee who needed the job to keep her family off of food stamps. Her vulnerability

16

made her an easy target for Hargrove, who displayed a propensity to prey on financially

vulnerable women under his supervision.

The jurors determined Ms. Marks's suffering justified a significant monetary award.  As

the Eleventh Circuit noted in *Myers*:

> A jury instructed to consider compensatory damages for emotional
> harm is asked to place a dollar amount on one person's suffering.
> The inquiry is inherently subjective, . . . as jurors bring their own
> experiences to bear on another person's humiliation, discomfort,
> and shame.  The objective – to make a plaintiff whole. . . . – plainly
> is a difficult one, . . . and the means employed are far from perfect.

*Myers*, 592 F.3d at 1213 (citations omitted).

When evaluating such subjective considerations as the extent of another person's

suffering, the court finds that the better course is to defer to the collective wisdom of the jury.

This deference is particularly appropriate when a plaintiff offers her own testimony plus the

testimony of others, as Ms. Marks did here.  Because Ms. Marks presented more than just "some

evidence" of mental anguish, the question whether she should recover for such mental anguish,

and, if so, how much, is a question best reserved for the jury.  *See Slack*, 988 So. 2d at 531.  After

comparing the evidence of intangible emotional damage presented in this case with numerous

Alabama cases, and keeping in mind the deference owed a jury's determination of damages, the

court cannot conclude that the evidence in this case fails to support the jury's award of $100,000

for emotional distress caused by USSA's wanton supervision of Hargrove.  Therefore, the court

refuses to remit the $100,000 award of compensatory damages for USSA's wanton failure to

supervise Hargrove.

II.    Due Process Constraints on Punitive Damages

USSA contends that the total amount of punitive damages after applying the caps –
$897,768 – still exceeds a constitutionally acceptable amount.  It urges reducing the total
punitive damage award to $450,000.  By applying the statutory caps, the court has already
reduced the jury's $2,400,000 punitive damage award against USSA by more than $1,500,000.
To reduce the award further would ignore the reprehensibility of USSA's conduct, and the jury's
determination that more than a slap on the wrist is required to get USSA's attention, to punish it
and deter others from similar conduct.

The court recognizes that grossly excessive or arbitrary punitive damage awards fail to
pass due process muster.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003);
*BWM of No. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *Myers v. Central Fla. Invs.*, 592 F.3d 1201,
1218 (11th Cir. 2010); *Goldsmith v. Bagby Elev. Co.*, 513 F.3d 1261, 1282 (11th Cir. 2008).
Under a due process analysis of a punitive damage award, the court should first "identify the
state's interest in deterring the relevant conduct and the strength of that interest."  *Myers*, 592
F.3d at 1218.  As the Eleventh Circuit recognized, "the state's interest in deterring defendants'
conduct is strong."  *Id.* (quoting Florida case law).

The State of Alabama has a substantial interest in protecting its citizens from egregious
sexual harassment in the workplace.  The abhorrence with which the Alabama Supreme Court
views egregious sexual harassment and the strength of its determination to redress that conduct is
reflected in its recognition that egregious sexual harassment is one of only three areas of conduct
constituting the tort of outrage, also known as intentional infliction of emotional distress.  *See*
*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (citing *Busby v. Truswal Sys. Corp.*, 551 So. 2d
322 (Ala. 1989)).  Conduct falling within the tort of outrage must be "so outrageous in character

18

and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Road Serv. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981). The jury in this case found that Hargrove's conduct rose to that outrageous level when it found him liable for intentional infliction of emotional distress.

Recognizing the powerful state interest involved, the court must next examine Supreme Court guidance. The Supreme Court in *Gore* established three guideposts for courts to consider in evaluating punitive damage awards: (1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between compensatory damages and the punitive damages award; and (3) the civil penalties authorized or imposed in similar cases. *Gore*, 517 U.S. at 575; *Goldsmith*, 513 F.3d at 1282.

The Supreme Court called the degree of reprehensibility "the most important indicium of an appropriate punitive damage award." *Campbell*, 538 U.S. at 419. The Eleventh Circuit also recognized this first factor as the "dominant consideration." *Goldsmith*, 513 F.3d at 1283. In considering the reprehensibility of conduct, this court must consider the five factors enunciated by the Supreme Court as

> whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419. Not all factors must be present, but the more factors present, the greater the degree of reprehensibility. *Id.*

Continuing to hide from the truth of the jury verdict and somehow still oblivious to the

19

nature of the jury's determination, USSA argues that its conduct was not reprehensible in this case.  Examining each factor in turn reveals that the conduct of USSA was indeed reprehensible enough to merit a substantial punitive damage award.

First, as to the harm caused Ms. Marks by USSA's conduct, Ms. Marks suffered physically, emotionally and financially.  As a result of the retaliation orchestrated by Hargrove, Ms. Marks's pay check was held up for one month, causing her considerable financial hardship, including having to apply for food stamps.  (Tr. 532-535; 2344.)  Because of her constructive discharge, she lost wages of $1,600.  She also testified extensively to the great emotional distress she suffered while working at USSA because of Hargrove's conduct, which included more than thirty unwanted touchings, more than fifty instances of sexually lewd language and the use derisive terms of a sexual nature, and repeated requests for sexual favors – all of which culminated in Hargrove dropping his pants and masturbating in front of Ms. Marks.  The emotional distress she suffered affected her ability to eat and sleep, her relationship with her husband, her self esteem, and her ability to look for other employment where she might have to work for a male supervisor.

As demonstrated at trial, USSA had received several prior complaints about Hargrove's inappropriate conduct around women under his supervision while he worked security detail in Louisiana after Hurricane Katrina.  Instead of suspending Hargrove and fully investigating the allegations as recommended by Human Resources, Al Sarnese, the vice president to whom Hargrove ultimately reported, intervened and swept the matter under the rug.  No one at the corporate office followed up to talk personally with the women affected, and disregarded their reports in spite of their supervisors' view that they were truthful.  No one followed up on rumors –

20

that turned out to be true – that Hargrove was having an affair with someone in his office; that "someone" turned out to be Melissa Rodriguez, Ms. Marks's immediate supervisor to whom she reported Hargrove's improper conduct and over whom Hargrove exercised considerable emotional, physical and financial power.  Although USSA had a written sexual harassment policy, it conducted little or no training of its corporate officers, field managers and supervisors, or employees concerning that policy.  The lack of training led both to an environment permeated with sexual harassment in the Alabama offices managed by Hargrove, and to a lack of awareness by numerous women employees as to avenues available to them to report violations – assuming that reports would have been heeded.  And reporting Hargrove's actions only led to retaliation.

When Ms. Marks first complained to her immediate supervisor Rodriguez about inappropriate sexual comments Hargrove made during her interview, Hargrove and Rodriguez showed up at Marks's work site.  They verbally accosted her and forced her to sign a written statement that Hargrove had not sexually harassed her.  The work environment did not improve as Hargrove's inappropriate conduct continued.  His conduct culminated in lewd requests and in his dropping his pants and masturbating in front of Ms. Marks in January 2007.

Ms. Marks testified that after she complained, problems arose with the scheduling of guards under her supervision approximately three days every week.  She attributed these problems to interference with the schedule by Hargrove and Rodriguez.  As a result, both Hargrove and Rodriguez screamed at and cussed her, and Hargrove threatened that he would make sure she never worked in the industry again.  This conduct began when she complained (January 2007) and continued until she "had enough and quit" (April 19, 2007).  Although Ms. Marks complained to her immediate supervisor as USSA's policy required, her supervisor Rodriguez acted in cahoots

with Hargrove to manufacture false documents in Ms. Marks's personnel file to discredit her. USSA conducted very little, if any, serious investigation into Ms. Marks's complaints. This cavalier attitude that permeated the corporate structure at USSA reflected "an indifference to or a reckless disregard of the health or safety of others."

Ms. Marks was not the lone victim of Hargrove's harassment. The women who Hargrove hired to work for him and who were the objects of his sexual harassment were, for the most part, financially vulnerable. Ms. Marks and the other women testified that they needed their jobs making $8 to $10 an hour. USSA's contention that Ms. Marks was not financially vulnerable because her husband worked – sometimes – and her mother helped out financially after she left USSA belittles the significance of her tight financial straights and further demonstrates USSA's calloused attitude toward its employees. The evidence demonstrated that Hargrove preyed on vulnerable women.

As alluded to above, the conduct of Hargrove and USSA involved repeated actions. USSA, through its state director Hargrove, subjected Ms. Marks to unwanted sexual touchings and comments from the day of her job interview until she had enough and quit – a period of eleven months. She was not the only victim, either. After Ms. Marks filed her EEOC complaint, women came out of the woodwork to complain about Hargrove's sexual harassment of them. USSA tried to discredit each woman, adopting Sarnese's apparent theory that the women were all just ganging up on Hargrove and lying about him. The jury disagreed and found these women credible, as reflected in the verdict.

The last factor concerning the degree of reprehensible conduct examines whether "intentional malice, trickery, or deceit, or mere accident" caused the harm. The jury answered that

question directly with its punitive damages awards.  The court's instructions concerning the awarding of punitive damages required that the jury find "malice or reckless indifference" to Ms. Marks's rights under Title VII, and that it find by *clear and convincing evidence* that the defendant "acted with wantonness or malice" under Alabama law.  The court further defined wantonness as "conduct carried on with a reckless or conscious disregard of the rights and safety of others," and malice as "the intentional doing of a wrongful act without just cause or excuse, either with the intent to injure . . . or under such circumstance that the law will imply an evil intent."  (Tr. 4068.)  Thus, acknowledging the presumption that the jury follows the court's instruction, the court finds this factor met.

All the factors as applied in this case reflect a great degree of reprehensibility in the conduct of USSA. The reprehensible conduct does not rest merely on Hargrove's sexual exploits at the office with the female employees he supervised,for which USSA is responsible.  The jury clearly found, as evidenced by its verdict, that USSA itself had not taken the necessary steps incumbent upon it to avoid and/or remedy sexual harassment within the company, or at least in the Alabama offices over which Hargrove exercised unfettered dominion.  The attitude demonstrated in court by its higher management personnel when they testified reflected the attitude that allowed the predator to do as he willed with his subordinates as long as he brought the money into the company coffers.  The reprehensible conduct in this case that went all the way up the corporate ladder justifies a substantial award of punitive damages.

The second *Gore* factor evaluates the ratio between punitive damages and the actual harm inflicted.  *Gore*, 517 U.S. at 581.  The Supreme Court, however, rejects the notion of a precise mathematical formula.  *Gore*, 517 U.S. at 582.

In this case, after reduction to meet the statutory caps, the total punitive damage award against USSA is $897,767.46 and the total compensatory damage award is $150,000.  The ratio of total punitive to compensatory damages is approximately 5.98 to 1.

Looking at the awards separately, the capped punitive damages allowed for the two Title VII violations totaled $251,600 and the total compensatory and lost wages award totaled $50,000.  The ratio of punitives to compensatory damages is 5.03 to 1.  As Judge Posner noted, "When Congress sets a limit and a low one, on the total amount of damages that may be awarded, the ratio of punitive to compensatory damages in a particular award ceases to be an issue of constitutional dignity."  *Lust v. Sealy, Inc.*, 383 F.3d 580, 590 (7th Cir. 2004).

As to the state law award, the capped punitive damage amount of $646,167.46 bears a ratio of 6.46 to 1 to the $100,000 compensatory damage award.  However one looks at these ratios – together 5.98 to 1 – or separately 5.03 and 6.46 to 1 – they fall well within ratios approved by the Eleventh Circuit.  *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1327, 1339 (11th Cir. 1999) (ratio of 100:1); *Goldsmith*, 513 F.3d at 1283, 1285 (ratio of 9.2:1); *U.S. EEOC v. W&O, Inc.*, 213 F.3d 600, 616-17 (11th Cir. 2000) (ratio of 8.3:1).

The significant state interest in protecting employees from repeated sexually offensive touching and comments, invasion of privacy, and intentional infliction of emotional distress in the workplace, as well as the strong public policy reflected in Title VII to eliminate sexual harassment, support the award of substantial punitive damages in this case.  The court cannot say that punitive damages of less than six times compensatory damages is grossly excessive or arbitrary.  Instead, this award balances deterrence and condemnation of USSA's conduct with an appropriate concern for proportionality in view of the egregious conduct involved in this case.

24

The third guidepost from *Gore* compares the punitive damage award to "civil or criminal penalties that could be imposed for comparable misconduct."  517 U.S. at 583.  The most obvious comparator of civil penalties authorized in comparable cases is the Title VII damage caps.  See 42 U.S.C. § 1981a(b)(3).  Because of USSA's size, that damage cap hits $300,000 – the highest amount of damages allowed.  The $300,000 cap applies to employers with more than 500 employees.  USSA had approximately 28,000 employees – 56 times the number of employees needed to reach the highest level of damages allowable under Title VII.  A total punitive damage award that is less than three times the Title VII maximum recovery is not unreasonable in this case given the extensive testimony concerning Hargrove's conduct, the company's refusal to acknowledge that he was anything other than a productive employee, and the vast number of employees who are susceptible to similar conduct by their supervisors because of the lax stand taken at headquarters to protect them from on-the-job harassment.

A comparison to criminal sanctions may also be appropriate.  *See Myers*, 592 F.3d at 1222-23 (examining criminal punishments for battery).  In this case, one of the underlying torts that supported the wanton failure to supervise was Hargrove's assault and battery.  That conduct most closely resembles third degree assault, which is a class A misdemeanor under Alabama law.  Ala. Code § 13A-6-22.  Hargrove's conduct also could be viewed as indecent exposure, another class A misdemeanor.  Ala. Code § 13A-6-68.  His conduct toward Ms. Marks approaches the criminal act of stalking, which is a class C felony.  Ala. Code § 13A-6-90.  Under Alabama law, a person is guilty of the crime of stalking if he "intentionally and repeatedly follows or harasses another person and . . . makes a credible threat, either expressed or implied, with the intent to place that person in reasonable fear of death or serious bodily harm."  Although Hargrove's

25

threats to Ms. Marks may not have involved death or serious bodily harm, he did intentionally

follow her to her work site, repeatedly harassed her with his lewd and sexually derisive comments,

repeatedly touched her without her consent, and set about to jeopardize her job when she

complained about his conduct.  Punishment for such offenses includes imprisonment of not more

than one year for class A misdemeanors, and not less than one year and one day or up to ten years

for a class C felony.  *See* Ala. Code §13A-5-7, 13A-5-6.  These penalties reflect serious criminal

sanctions.  The punitive damages award imposed here "fits comfortably within this array of

potential sanctions."  *Myers*, 592 F.3d at 1223.

Finally, the court finds that the punitive damage award is not constitutionally excessive

when considering the financial resources of USSA.  The evidence produced at trial demonstrated

that USSA, a private corporation, has total assets of just under three million dollars and that

shareholder equity exceeds nine million dollars.  (Tr. 4058.)  USSA employs 28,000 people, with

only 100 of those located in the corporate office.  (Tr. 4060.)  The cavalier attitude of those in

corporate headquarters about sexual harassment put thousands of employees at risk of being

subjected to the kind of conduct suffered by Ms. Marks and the other women who testified. The

award, although sizeable, will not bankrupt USSA.  Maybe it will get the attention of those people

at headquarters who should develop and implement a real workable sexual harassment policy to

prevent such exploitation of employees in the future.

The purpose of punitive damages is to punish reprehensible conduct and deter similar

conduct.  The court agrees with the jury that only a sizeable punitive damage award would convey

to USSA that its cavalier attitude toward sexual harassment and other offensive conduct in the

workplace will not be tolerated.  The company put the income generated by Hargrove ahead of the

right of its employees to be free from sexual harassment, retaliation, unwanted touching and

sexually offensive conduct, and intentional infliction of emotional distress in the workplace.  Only

a substantial monetary award will have the intended deterrent effect on USSA.

For all these reasons, the court refuses to reduce the jury's punitive damage award further

than required by the statutory caps.  A separate order will be entered simultaneously.

DONE and ORDERED this 26th day of October 2010.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE